

**James Everett Shelton**
**316 Covered Bridge Road**
**King of Prussia, PA 19406**
**(484) 626-3942**
**jeshelton595@gmail.com**

**Plaintiff, Pro Se**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES EVERETT SHELTON** ) | |
| **316 Covered Bridge Road** ) | |
| **King of Prussia, PA 19406** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action** |
| ) | |
| **vs.** ) | **No.  18  1655** |
| ) | |
| **CENTERPOINTE LENDING STUDENT LOAN** ) | |
| **SERVICES** ) | **FILED** |
| **11800 Central Avenue, Unit 225A,** ) | **APR 19 2018** |
| **Chino, CA 91710** ) | **KATE BARKMAN, Clerk** |
| ) | By_____ Dep. Clerk |
| **JEFFREY R. SILHANEK** ) | |
| **11800 Central Avenue, Unit 225A,** ) | |
| **Chino, CA 91710** ) | |
| ) | |
| **SCOTT E. SHALLER** ) | |
| **11800 Central Avenue, Unit 225A,** ) | |
| **Chino, CA 91710** ) | |
| ) | |
| **Defendants** ) | **Jury Trial Demanded** |
| ) | |

### COMPLAINT:

Plaintiff JAMES EVERETT SHELTON brings this action for damages, restitution,

reinstatement, statutory damages, court costs, and injunctive relief under rights pursuant to

Federal Statute under 47 U.S.C. 227, and 47 C.F.R. 64 for the *ultra vires* illegal actions and

deliberate and knowing tortious activity of CENTERPOINTE LENDING STUDENT LOAN

SERVICES ("Centerpointe"), JEFFREY R. SILHANEK ("Silhanek"), individually and as Chief

1

Executive Officer of Centerpointe, and SCOTT E. SHALLER, individually and as Chief Financial Officer of Centerpointe, in negligently and/or willfully contacting Plaintiff via Plaintiff's telephone to solicit sales ("Sales Calls") in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* and related claims that form part of the same claim or controversy. Plaintiff demands a trial by jury, and complains and alleges as follows:

## I.      Introduction

1.      Plaintiff James Everett Shelton ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

2.      Plaintiff brings this action to challenge Centerpointe's practices in the telephone solicitation of its products and services. Specifically, Plaintiff challenges Centerpointe's and Centerpointe's agents' illegal telephone solicitations by which it markets its products and services through its robocalls, and Centerpointe's Agent's failure to maintain a Do-Not-Call list or Do-Not-Call policy.

3.      "Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the Federal Communication Commission.[1]

4.      The TCPA is designed to protect consumer privacy by prohibiting unsolicited telemarketing calls to cellular telephones, unless the caller has the "prior express written consent" of the called party.

---

[1] *Omnibus TCPA Order*, GC Docket 02-278, FCC 15-72, 2015 WL 4387780, ¶ (July 10, 2015)

5.     Plaintiff alleges that Defendant Centerpointe Lending Student Loan Services ("Centerpointe") hired a third-party, Ivault Services Phil, Inc. ("Ivault"), a Phillipine corporation, who commissioned a telemarketing call to Plaintiff's cellular telephone number for the purposes of advertising Centerpointe's services, using an automatic telephone dialing system (ATDS), which is prohibited by the TCPA.

6.     Centerpointe itself then directly placed several more automated calls to the Plaintiff, including one after Plaintiff told Centerpointe to stop calling.

7.     Plaintiff never consented to receive any of these calls.

8.     All of the claims asserted herein arise out of Centerpointe's illegal telephone solicitation campaign and are a common fact pattern.

## II.     Jurisdiction and Venue

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this court in that Defendants conduct business in, and a substantial part of the events giving rise to plaintiff's claims occurred in, Pennsylvania's Montgomery County. Plaintiff received the phone calls to his private mobile telephone number as a permanent resident of Montgomery County. Defendant Centerpointe conducts business in this judicial district by calling Pennsylvania consumers. Plaintiff's telephone number has a (484) Pennsylvania area code and is registered to Plaintiff's home address. Each of the Defendants has sufficient minimum contacts with this county, and otherwise purposely avail themselves of the markets in this county. Also, see *Lary V. The Doctors Answer, LLC* CV-12-S-3510-NE (N.D. Ala. March 8, 2013.), a Federal Telephone Consumer Protection Act case, which held that "venue is proper in the district where [plaintiff] resides because the injury did not occur when the facsimile was sent…; it occurred when the [facsimile] was received."

## III.  Parties

11.     Plaintiff JAMES EVERETT SHELTON ("Plaintiff") is an individual who received the alleged phone calls on his private mobile telephone line mentioned herein. Plaintiff is an adult individual and citizen of the Commonwealth of Pennsylvania who has a residence of 316 Covered Bridge Road, King of Prussia, PA 19406.

12.     Defendant CENTERPOINTE LENDING STUDENT LOAN SERVICES ("Centerpointe") is a California corporation with a registered principal address of 11800 Central Avenue, Unit 225A, which transacts business in, *inter alia*, Montgomery County, Pennsylvania. Centerpointe markets and sells, *inter alia*, student loan relief services.

13.     Defendant JEFFREY R. SILHANEK ("Silhanek") is an adult individual who is the Chief Executive Officer and principal owner of Centerpointe. SILHANEK is the primary individual who reaps the benefit of the tortious and illegal conduct described herein that is technically carried out only in Centerpointe's name. Such tortious, or *ultra vires*, conduct exceeds the permissible actions of corporations both in Pennsylvania, California, and nationwide.

14.     Defendant SCOTT E. SCHALLER ("Schaller") is an adult individual who is the Chief Financial Officer and an executive of Centerpointe. As an executive, SCHALLER is an individual who reaps the benefit of the tortious and illegal conduct described herein that is technically carried out only in Centerpointe's name. Such tortious, or *ultra vires*, conduct exceeds the permissible actions of corporations both in Pennsylvania, California, and nationwide.

15.     At all times herein mentioned, Centerpointe, Silhanek, and Schaller (collectively, "Defendants"), and each of them, were an agent or joint venture of each of the other, and in doing the acts alleged herein, were acting within the scope of such agency. Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified,

4

approved, joined in, acquiesced and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

16.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to the other Defendants in committing the wrongful acts alleged herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoing complained of each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

17.     At all times herein mentioned, Defendants conspired by means of mutual understanding, either expressly or impliedly, among themselves and others in engaging and/or planning to engage in the activities detailed herein to accomplish the wrongful conduct, wrongful goals, and wrongdoing.

## Background
### The Telephone Consumer Protection Act

18.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

19.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

20.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

21.     The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003). In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines.

Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

**The TCPA imposes personal liability on individuals who participate in or commission telemarketing calls.**

6

22.     Under the TCPA, an individual such as Silhanek or Schaller may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 227 of the TCPA, which reads, *inter alia*:

[T]he act, omission, or failure of any agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*

47 U.S.C. § 227 (emphasis added).

23.     When considering individual officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. See, *e.g., Jackson v. Five Star Catering, Inc., v. Beason,* 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

24.     Defendant Silhanek and Schaller is personally liable under the "participation theory" of liability because he is the CEO and/or Principal owner of Centerpointe, knew of Centerpointe's violations, and directed employees and/or agents of Centerpointe to continue making those violations.

25.     This is because Defendant Silhanek and Schaller authorized and oversaw each of Centerpointe's telemarketing processes and calls which were made on behalf of Centerpointe.

7

26.     Furthermore, Defendant Silhanek and Schaller are also personally liable because they were responsible for ensuring Centerpointe's agents and/or employees' TCPA compliance.

## IV.     Factual Allegations

27.     Centerpointe provides federal student loan repayment and forgiveness program document preparation assistance.[2]

28.     Centerpointe uses telemarketing to promote its services.

29.     Centerpointe's telemarketing efforts also include the use of "automatic telephone dialing systems" or "robocalls" to transmit a message, as prohibited by 47 U.S.C. § 227(b)(1)(B).

30.     At all times material hereto, Plaintiff was the subscriber of the telephone number 484-626-3942 and paid his cell phone bill through T-Mobile.

31.     Plaintiff has never taken out any student loans.

32.     Plaintiff's personal cellular telephone number, 484-626-3942, has been successfully registered on the National Do-Not-Call Registry since June 26, 2015, more than 31 days prior to the calls.

33.     On or about March 22, 2018, Plaintiff received a prerecorded "robocall" to his cellular telephone number, 484-626-3942, which played an artificial message soliciting student loan relief services.

34.     The prerecorded message was very similar in content, if not identical, to the following:

"…*Student loans being serviced by Navient, Zelnet, or other federal loan servicers. The government has mandated that all third-party loan servicers notify their clients of government forgiveness programs available through the Department of Education. We are showing that your*

---

[2] See http://certifiedstudentloanservices.com/our-services/

*servicer has not offered forgiveness programs, and has failed to notify you. If you have your FSA ID number, and want to check eligibility, press 5. If you need help retrieving it, press 7."*

35.     After pressing the appropriate number on his cell phone, Plaintiff was connected with a live human being.

36.     Plaintiff heard a distinctive balloon-popping sound prior to being connected with a human being, who had a strong foreign accent.

37.     When a human being arrived on the phone line, the Plaintiff was asked several questions and received a scripted sales pitch about federal student loan forgiveness programs. Plaintiff was deemed "eligible" for such programs after giving satisfactory responses to the questions.

38.     During that call, Plaintiff took steps to ascertain the identity of the caller and feigned interest for this exact reason, namely by requesting that the caller send Plaintiff an e-mail with their company information. However, Plaintiff never consented to receiving any additional telemarketing calls.

39.     As a point of fact, to the extent that "consent" was supplied during the call, that was done in order to discover the identity of the caller and for no other reason. Courts have held this to be legitimate and have not held such "consent" to be detrimental to a plaintiff bringing a TCPA action. *See* for instance, Bank v. Caribbean Cruise Line, which held that "Purporting to obtain consent during the call, such as requesting that a consumer "press 1" to receive further information, does not constitute the prior consent necessary to deliver the message in the first place, as the request to "press 1" is part of the telemarketing call.... As the FCC has stated, the consent must be made before the call."

9

40.     The call was then transferred to an agent, who attempted to sell the Plaintiff
Centerpointe's services.

41.     The agent from Centerpointe asked Plaintiff to provide him with his social security
number and FSA ID number.

42.     Plaintiff asked the agent to send him an e-mail confirming his identity and company
affiliation, however, Plaintiff did not receive an e-mail on March 22.

43.     Subsequently thereafter, because Plaintiff was unwilling to provide such information, the
call was disconnected.

44.     On March 22, 2018 at 2:27 PM, Plaintiff receive an automated voicemail from "James"
with Centerpointe, which said: "*Hi this is James with student loan services giving you a call
back. I was just calling to go over some of the updates on your federal student loans and the
forgiveness options that are available for you. I know that the last time we tried to get you on the
phone with an advisor, there no one was available, or the call either dropped, but I would be
more than happy to help you get your FSA ID pulled up, and that way we can go over your file.
So if you can just go ahead and give me a call back whenever time permits, my number here is
951-463-4356. I will be in the office until 5 PM Pacific Standard Time, otherwise I will be back
in the office tomorrow at 8 AM. Once again, my number here is 951-463-4356, and my name is
James with student loan services.*"

45.     The foregoing voicemail was clearly made using automated dialing equipment because it
was totally generic, impersonal, and scripted, which indicates that it was made using a
prerecorded message or "robocall".

46.     At no time did Plaintiff provide his consent to receive any further calls from Centerpointe
and/or its agents.

47. On March 26, 2018 at 1:54 PM, Plaintiff received the following automated voicemail from Centerpointe: "*Hi, this is James with student loan servicing. We've attempted to reach you regarding the completion of your federal student loan forgiveness program, unfortunately we've had no success. This is the final attempt to contact you before the eligibility for these programs are revoked. If you could please give me a call back at your earliest convenience, my number here is 951-463-4356. Once again, this is James with student loan servicing, my number is 951-463-4356. Thank you.*"

48. Once again, the foregoing voicemail was clearly made using automated dialing equipment because it was totally generic, impersonal, and scripted, which indicates that it was made using a prerecorded message or "robocall".

49. Defendants provided the generic names of "Student Loan Servicing" or "Student Loan Services" in a deliberate attempt to conceal their true identity, in an effort to duck liability under the TCPA.

50. As a result of these automated calls, on March 28, 2018 at 11:50 AM, Ashley Burnes, ashley@centerpt.net, contacted the Plaintiff by e-mail attempting to get Plaintiff to purchase Centerpointe's student loan forgiveness services.

51. Prior to these unsolicited calls, the Plaintiff has never done any business with Centerpointe and Plaintiff never provided Centerpointe with his cellular telephone number.

52. Centerpointe did not have the Plaintiff's prior express written consent to make these calls.

53. In fact, before filing this lawsuit, the Plaintiff wrote to Centerpointe on March 29, 2018 asking if they had his prior express written consent to make the calls, but Centerpointe did not provide any evidence of consent.

11

54.     Plaintiff also requested in his e-mail to have his number placed on Centerpointe's internal Do-Not-Call list, and requested to receive a copy of Centerpointe's internal company Do-Not-Call policy.

55.     Instead of complying with Plaintiff's requests not to receive any more calls and discuss a reasonable resolution of Plaintiff's meritorious TCPA claims, Defendants boldly decided to preemptively sue Plaintiff! On April 9, 2018, Centerpointe filed a lawsuit against Plaintiff in the San Bernadino County Superior Court, small claims division, State of California, case number SMCFS1802430, seeking damages of $5,000 from Plaintiff for "extortion" and "abuse of process" under California Penal Code Section 518 PC. Defendant Centerpointe's complaint in small claims court is attached as Exhibit A.

56.     Plaintiff did not commit extortion or abuse of process in his communications with Defendants. To the contrary, Plaintiff was very reasonable and professional, having given the Defendants multiple opportunities to explain their actions or produce evidence of consent to receive calls. No such evidence was ever provided, because it does not exist.

57.     In Centerpointe's frivolous and completely improper lawsuit against Plaintiff, who is not a resident of the State of California and cannot be served outside the State of California in small claims court pursuant to C.C.P 116.340(e)(f), Centerpointe admits to placing two (2) calls to Plaintiff. See Exhibit A.

58.     Defendants failed and/or refused to provide a written copy of their internal company Do-Not-Call policy to Plaintiff, despite two (2) written e-mail requests.

59.     Pursuant to 47 CFR 64.1200(d)(1), a telemarketer is required, upon request, to send a consumer a written copy of their company Do-Not-Call Policy.

12

60.      Defendants failed and/or refused to put Plaintiff's number on their internal company Do-Not-Call list.

61.      In fact, on April 11, 2018, despite knowing *full well* that Plaintiff did not want to receive any more calls and intended to file a lawsuit against defendants to hold them accountable for violating the TCPA, Defendants called Plaintiff *again!*

62.      In the call that occurred on April 11, an agent, "Pat", from Centerpointe, left an automated voicemail, which said, "*Hey, how's it going? This is Pat with student loan services, giving you a call about the student loan forgiveness program that we were discussing a week or two ago. I just was reviewing your file and I saw that we never got a chance to finish up the process, but I want to make sure that we reach out to you personally to see if there's any questions about the programs that you might have, so that we can get your student loans situated here. Today is April 11, I'll be in the office today until 5 PM pacific standard time. However, if I'm not available, feel free to speak with any of my colleagues, they'll be able to get you taken care of as well. My best contact number is going to be 951-463-4356. Once again, that phone number is 951-463-4356. Hope to hear from you soon.*"

63.      To the extent Defendants contend that they obtained consent or agreement from Plaintiff for the calls at issue here, the Telemarketing Sales Rule, 16 C.F.R. § 310.5(a)(5), requires that such records be maintained. In any event, consent is an affirmative defense under the TCPA, and is unavailable unless Defendants can show that they had prior express consent in writing, and that they have otherwise complied with all of the requirements of 47 C.F.R. § 64.1200(c)(2), including maintaining written procedures on national do-not-call rules, training personnel on national do-not-call rules, maintaining an internal do-not-call list, and accessing the national do-not-call database no more than 31 days prior to making any calls, and maintaining records

13

documenting such access. Defendants did not have prior express written consent to such calls from Plaintiff, and did not produce any such written consent, even though the Plaintiff contacted Centerpointe inquiring about the calls before filing this lawsuit.

64.     Additionally, to the extent Plaintiff seeks to recover damages for these violations, see Charvat v. NMP, LLC, in which the Sixth Circuit Court of Appeals held that it is possible to allege violations of BOTH subsections of 47 USC § 227(b) [robocalls] and 47 USC § 227(c) [other violations], allowing for multiple violations per call. See also, Lary v. Trinity Physician Fin. & Ins. Servs., in which the 11th Circuit, under 6th Circuit guidance in the Charvat cases, found that it is possible, beyond alleging multiple violations per call based on overall subsection (as in the Charvat case), to allege multiple violations within each subsection, such as the failure to place a number on an internal DNC or provide a copy of a do-not-call policy (both of which are violations of 47 CFR 64.1200(d)(1) and (d)(3), and 47 USC § 227(c) [ie. Subsection C]).

65.     Plaintiff is using an identical method of calculating damages under the TCPA to that of multiple Judges in this Court, including District Judge Legrome D. Davis of the United States District Court for the Eastern District of Pennsylvania, in the case of Shelton v. Doan Solutions, LLC 2:17-cv-02368 (Doc. 5). In his opinion determining damages in a default judgment motion, Judge Davis found, under Sixth and Eleventh Circuit guidance, that the TCPA's "Do-Not-Call List" provision and "Do-Not-Call Policy" provisions were implied as causes of action under 47 CFR 64.1200, et. seq. and that the procedural violations of failing to put Plaintiff on Defendant's do-not-call list or provide Plaintiff a copy of Defendant's do-not-call policy were separate procedural violations of 47 C.F.R 64.1200(d)(1) and (d)(3), actionable under 47 U.S.C §227(c), in addition to violations of 47 U.S.C § 227(b)(1)(A) and 47 U.S.C § 227(c)(3)(F).

14

66.     In *Andrew Perrong v. Tranzvia LLC*, No. 2:17-cv-03664, District Judge Joel H. Slomsky of the United States District Court for the Eastern District of Pennsylvania also ruled, after hearing and good cause shown, that the TCPA's "Do-Not-Call List" provision and "Do-Not-Call Policy" provisions were implied as causes of action under 47 CFR 64.1200, et. seq. and that the procedural violations of failing to put Plaintiff on Defendant's do-not-call list or provide Plaintiff a copy of Defendant's do-not-call policy were separate procedural violations of 47 C.F.R 64.1200(d)(1) and (d)(3), actionable under 47 U.S.C §227(c), in addition to violations of 47 U.S.C § 227(b)(1)(A) and 47 U.S.C § 227(c)(3)(F). Judge Slomsky awarded the plaintiff treble damages of $1,500 for each instance of "failure to provide a copy of defendant's Do-Not-Call policy" and $1,500 for each instance of "failure to put plaintiff's number on defendant's Do-Not-Call list", for a total judgment award of $45,000.

67.     Even if someone else submitted Plaintiff's telephone number to Centerpointe, that does not mean *Plaintiff* consented to receive telemarketing calls. Courts have held that the definition of the "called party" is the subscriber of the cell phone service or user of the cell phone called. See Breslow v. Wells Fargo Bank, N.A., 857 F. Supp. 2d 1316 (S.D. Fla. 2012)., Leyse v. Bank of America, N.A., No. 12-3249 (3rd Cir. 2013), and Osorio v. State Farm Bank, FSB, 746 F.3d 1242 – 2014, wherein the Eleventh Circuit held that the *definition of the "called party" was not the intended recipient of the call, but was the actual recipient.*

68.     Plaintiff pays for each incoming and outgoing call on his telephone under an unlimited calling arrangement, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii).

69.     Plaintiff received the calls on his private mobile telephone, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii). Plaintiff's telephone number is registered with T-Mobile as a cellular telephone number and is used for personal purposes.

15

70.     These telephone solicitations constituted "calls" under the TCPA that were not for
emergency purposes.

71.     Plaintiff did not provide any one, more, or all Defendants, nor any agent of
Defendants, prior express written consent, or any other form of consent, express or implied, to
cause Plaintiff to receive telephone calls on his personal telephone.

72.     Plaintiff had no prior business relationship with any one, more, or all of Defendants.

73.     Plaintiff was harmed by these calls. Plaintiff was temporarily deprived of legitimate use
of his phone because the phone line was tied up during the telemarketing calls and his privacy
was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating,
obnoxious, annoying, were a nuisance and disturbed the solitude of plaintiff. The calls caused
Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from
otherwise using his telephone for lawful purposes.

## Defendants are Vicariously Liable for its Overseas Telemarketer's TCPA Violations

74.     Defendants are each a "person," as defined by 47 U.S.C. § 153(39).

75.     For more than 20 years, the Federal Communication Commission has explained that its
"rules generally establish that the party on whose behalf a solicitation is made bears ultimate
responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC
Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

76.     In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a
telephone call is made bears the responsibility for any violations. *Id.*

77.     On May 9, 2013, the FCC released a Declaratory Ruling reiterating that a corporation or
other entity that contracts out its telephone marketing "may be held vicariously liable under

16

federal common law principles of agency for violations of either section 227(b) or section 227(c)

that are committed by third-party telemarketers."[3]

78. In that Order, the FCC instructed that sellers such as Centerpointe may not avoid liability

by outsourcing telemarketing:

[A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

79. The May 2013 FCC Ruling held that, even absent evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

80. The FCC has rejected a narrow view of TCPA liability, including the assertion that a

seller's liability requires a finding of formal agency and immediate direction and control over the

third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

81. In fact, Centerpointe received a complaint about its third-party telemarketing practices that

are alleged to have violated the TCPA *prior* to the calls placed to the Plaintiff.

82. Third-party telemarketer Ivault Services Phil, Inc., a Philippine corporation, is believed to

have made at least one telemarketing call described herein "on behalf of" Centerpointe within the

---

[3]    *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

meaning of the FCC's Declaratory Rulings and 47 U.S.C. § 227(c)(5). See Exhibit B. In the alternative, Defendants hired another telemarketer who, like Ivault, appears to ignore TCPA compliance regulations and laws.

83.     Defendants voluntarily provided their telemarketing contract with Ivault to another man, Ken Johansen.

84.     Mr. Johansen, an Ohio resident, also sued Centerpointe. Johansen filed suit in the Franklin County Municipal Court, State of Ohio and obtained a default judgment in the amount of $1,578.00 against Centerpointe. Upon information and belief, Centerpointe continues to flaunt the Ohio court's ruling by failing to pay the judgment; now, Centerpointe merely resorts to preemptively suing consumers such as the Plaintiff in foreign jurisdictions that write letters demanding not to be called and/or threaten to file claims in court to get the harassing calls to stop.

85.     The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

[A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd at 6592 (¶ 46).

86.     By engaging Ivault and/or other telemarketers to make calls on behalf of its agents to generate new business, Centerpointe "manifest[ed] assent to another person . . . that the agent

18

shall act on the principal's behalf and subject to the principal's control" as described in the

Restatement (Third) of Agency. Similarly, by accepting these contacts, Ivault or other

telemarketers "manifest[ed] assent or otherwise consent[ed] . . . to act" on behalf of

Centerpointe, as described in the Restatement (Third) of Agency.

87.     Centerpointe is vicariously liable for the Ivault telemarketing call because it actively

participated in those calls through guidelines it directed Ivault to follow for generating new

business.

88.     Centerpointe is also vicariously liable for the Ivault telemarketing call because it actively

participated in the calls by "allow[ing] the outside sales entity access to information and systems

that normally would be within the seller's exclusive control", when Centerpointe allowed Ivault

access to its customer lists and leads.

89.     Centerpointe maintains interim control over its agents' actions, both as to telemarketing

and other activities by directing the content of their agents' advertising as well as approving the

scripting that is used.

90.     Centerpointe knew (or reasonably should have known, from Johansen's complaint and

lawsuit) that Ivault was violating the TCPA on its behalf, and failed to take effective steps within

its power to force the telemarketer to cease that conduct. Any reasonable seller that accepts

telemarketing leads would, and indeed *must*, investigate to ensure that those calls were made in

compliance with the National Do Not Call Registry rules and regulations.

91.     In fact, in response to a complaint made by Ken Johansen, Jeff Silhanek divulged that

Ivault was the telemarketer his company contracted with to make outbound calls on

Centerpointe's behalf. Instead of taking affirmative steps to terminate Ivault and obtain the

services of a lawful telemarketing company that would scrub their leads against the Do-Not-Call

19

registry, Defendants continued to work with telemarketers that brazenly violated the TCPA, and continue to do so.

92.    By engaging Ivault or similar telemarketing companies to essentially break the law on Centerpointe's behalf to generate new business, and by accepting the benefits of the resulting sales of Centerpointe's services, Centerpointe thereby ratified the use of unlawful calls as alleged in this case.

93.    Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

## Causes Of Action

### First Cause of Action

(Negligent Violation of the TCPA "RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)

94.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

95.    As a result of Defendants' and Defendants' agents negligent violations of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

96.    Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

## Second Cause of Action

(Knowing and/or Willful Violation of the TCPA
"RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)

97.     Plaintiff incorporates and realleges, as though fully set forth herein, each of the
paragraphs above.

98.     As a result of Defendants' and Defendants' agents knowing and/or willful violations
of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself treble damages, as provided by statute,
up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3).

99.     Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting
such conduct in the future.

## Third Cause of Action

(Negligent Violation of the TCPA "Sales Call" Prohibition, 47 U.S.C. § 227 et seq.)

100.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the
paragraphs above.

101.    As a result of Defendants' and Defendants' agents negligent violations of 47 U.S.C.
§ 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself $500 in statutory
damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

102.    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting
such conduct in the future.

## Fourth Cause of Action

(Knowing and/or Willful Violation of the TCPA
"Sales Call" Prohibition, 47 U.S.C. § 227 et seq.)

103.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

21

paragraphs above.

104.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(c)(5).

105.    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

### Fifth Cause of Action

(Negligent Violation of the TCPA "Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

106.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

107.    As a result of Defendants' and Defendants' agents' negligent violations of 47 CFR 64.1200(d)(1), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to the implied private right of action.

### Sixth Cause of Action

(Knowing and/or Willful Violation of the TCPA
"Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

108.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

109.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 CFR 64.1200(d)(1) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for each and every violation, pursuant to the implied private right of action.

### Seventh Cause of Action

(Negligent Violation of the TCPA "Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

110.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

111.   As a result of Defendants' and Defendants' agents' negligent violations of 47 CFR 64.1200(d)(3), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to the implied private right of action.

### Eighth Cause of Action

(Knowing and/or Willful Violation of the TCPA
"Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

112.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

113.   As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 CFR 64.1200(d)(3) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for each and every violation, pursuant to the implied private right of action.

### WHEREFORE, Plaintiff prays for relief against defendants, and each of them, as follows:
### V.      Prayer for Relief

On Causes of Action 1-8:

1.  For awards of $500 for each negligent violation as set forth in actions 1-6.

2.  For awards of $1,500 for each knowing and/or willful violation as set forth in actions 1-8.

3.  Injunctive relief against Defendants, and each of them, to prevent future wrongdoing;

23

Total statutory damages: **$15,000** (Four counts each of: "Robocall", "Sales call to a number registered on the National Do-Not-Call Registry", and one count each of: "Failure to provide a copy of Defendant's Do-Not-Call Policy", and "Failure to Put Plaintiff's Number on Defendants' Do-Not-Call list", with treble damages for each.)

4. Prejudgment interest at the maximum legal rate;

5. Costs of suit herein incurred; and

6. All such other and further relief as the Court deems proper.

## VI.    **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: April 19, 2018                                    *James E. Shelton*

James Everett Shelton
*Plaintiff, Pro Se*
316 Covered Bridge Road
King of Prussia, PA 19406
Phone: 484-626-3942
Jeshelton595@gmail.com

24

## **VERIFICATION**

I, JAMES EVERET SHELTON, Plaintiff, Pro Se, verify that the facts set forth in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that the statements made herein are subject to the penalties of 18 PA. C.S. § 4904 related to unsworn falsification to authorities.

Dated: April 19, 2018

*James E Shelton*

JAMES EVERETT SHELTON

SMALL CLAIMS CASE INFORMATION   **EXHIBIT A**
FONTANA DISTRICT


CASE NAME: CENTERPOINTE -V- SHELTON
CASE NBR.: SMCFS1802430


CENTERPOINTE LENDIND STUDENT LOANS  JAMES E SHELTON
11800 CENTRAL AVENUE UNIT 225A      316 COVERED BRIDGE ROAD
CHINO CA 91710                      KING OF PRUSSIA PA 19406



-----------------------------------------------------------------


CLAIM FILED ON: 04/09/18          AMOUNT: 5,000.00
                                  VENUE CODE: A

A
HEARING DATE: 06/12/18
TIME: 10:00
DEPARTMENT: F7


NATURE OF ACTION: 03/28/18 - SEE ATTACHMENT



*****************************************************************
END OF CASE PRINT

| **SC-100** | **Plaintiff's Claim and ORDER to Go to Small Claims Court** |
|---|---|

## Notice to the person being sued:

- You are the defendant if your name is listed in ② on page 2 of this form. The person suing you is the plaintiff, listed in ① on page 2.
- You and the plaintiff must go to court on the trial date listed below. If you do not go to court, you may lose the case.
- If you lose, the court can order that your wages, money, or property be taken to pay this claim.
- Bring witnesses, receipts, and any evidence you need to prove your case.
- Read this form and all pages attached to understand the claim against you and to protect your rights.

## Aviso al Demandado:

- Usted es el Demandado si su nombre figura en ② de la página 2 de este formulario. La persona que lo demanda es el Demandante, la que figura en ① de la página 2.
- Usted y el Demandante tienen que presentarse en la corte en la fecha del juicio indicada a continuación. Si no se presenta, puede perder el caso.
- Si pierde el caso la corte podría ordenar que le quiten de su sueldo, dinero u otros bienes para pagar este reclamo.
- Lleve testigos, recibos y cualquier otra prueba que necesite para probar su caso.
- Lea este formulario y todas las páginas adjuntas para entender la demanda en su contra y para proteger sus derechos.

*Clerk stamps date here when form is filed.*

**ELECTRONICALLY FILED**
BY SUPERIOR COURT
OF CALIFORNIA, COUNTY OF
**San Bernardino**
on **Apr 9, 2018**
*CLERK OF THE SUPERIOR COURT*
*Deputy Clerk:  Arianna Yepez*
x

*Fill in court name and street address:*

**Superior Court of California, County of**
**SAN BERNARDINO**

17780 Arrow Hwy.
Fontana, CA 92335
Fontana District

*Court fills in case number when form is filed.*

**Case Number:**
SMCFS1802430

**Case Name:**
Centerpointe Lending Student Loans Services
vs.
James E Shelton

### Order to Go to Court

**The people in ① and ② must go to court:** *(Clerk fills out section below.)*

| Trial Date → | Date | Time | Department | Name and address of court, if different from above |
|---|---|---|---|---|
| | 1.  06/12/2018 | 10:00 AM | F7 | |
| | 2. | | | |
| | 3. | | | |
| | Date: 4/9/18 | | Clerk, by  Arianna Yepez | , Deputy |

## Instructions for the person suing:

- You are the plaintiff. The person you are suing is the defendant.
- *Before* you fill out this form, read form SC-100-INFO, *Information for the Plaintiff,* to know your rights. Get SC-100-INFO at any courthouse or county law library, or go to *www.courts.ca.gov/smallclaims/forms.*
- Fill out pages 2 and 3 of this form. Then make copies of **all** pages of this form. (Make one copy for each party named in this case and an extra copy for yourself.) Take or mail the original and these copies to the court clerk's office and pay the filing fee. The clerk will write the date of your trial in the box above.
- You must have someone at least 18—not you or anyone else listed in this case—give each defendant a court-stamped copy of all five pages of this form and any pages this form tells you to attach. There are special rules for "serving," or delivering, this form to public entities, associations, and some businesses. See forms SC-104, SC-104B, and SC-104C.
- **Go to court on your trial date listed above.** Bring witnesses, receipts, and any evidence you need to prove your case.

Judicial Council of California, *www.courts.ca.gov*
Revised January 1, 2017, Mandatory Form
Code of Civil Procedure, §§ 116.110 et seq.,
116.220(c), 116.340(g)

**Plaintiff's Claim and ORDER
to Go to Small Claims Court**
**(Small Claims)**

**SC-100, Page 1 of 5**


Plaintiff *(list names):*

Centerpointe Lending Student Loans Services

**Case Number:**

SMCFS1802430

**(1) The plaintiff (the person, business, or public entity that is suing) is:**

Name: Centerpointe Lending Student Loans Services       Phone: (909) 364-0631

Street address: 11800 Central Avenue Unit 225A       Chino       CA       91710
       *Street*                                       *City*       *State*       *Zip*

Mailing address *(if different):* _____
       *Street*                                       *City*       *State*       *Zip*

**If more than one plaintiff, list next plaintiff here:**

Name: _____       Phone: _____

Street address: _____
       *Street*                                       *City*       *State*       *Zip*

Mailing address *(if different):* _____
       *Street*                                       *City*       *State*       *Zip*

☐ *Check here if more than two plaintiffs and attach form SC-100A.*
☐ *Check here if either plaintiff listed above is doing business under a fictitious name. If so, attach form SC-103.*
☐ *Check here if any plaintiff is a "licensee" or "deferred deposit originator" (payday lender) under Financial Code sections 23000 et seq.*

**(2) The defendant(the person, business, or public entity being sued) is:**

Name: James E Shelton       Phone: (484) 626-3942

Street address: 316 Covered Bridge Road       King of Prussia       PA       19406
       *Street*                                       *City*       *State*       *Zip*

Mailing address *(if different):* _____
       *Street*                                       *City*       *State*       *Zip*

**If the defendant is a corporation, limited liability company, or public entity, list the person or agent authorized for service of process here:**

Name: _____       Job title, if known: _____

Address: _____
       *Street*                                       *City*       *State*   *Zip*

☐ *Check here if your case is against more than one defendant, and attach form SC-100A.*
☐ *Check here if any defendant is on active military duty, and write his or her name here:* _____

**(3) The plaintiff claims the defendant owes $ 5,000.00** . *(Explain below):*

a. Why does the defendant owe the plaintiff money?
[See Attachment(s), Item 3]

When did this happen? *(Date):* _____

b. If no specific date, give the time period: *Date started:* 03/28/2018       *Through:* 04/09/2018

c. How did you calculate the money owed to you? *(Do not include court costs or fees for service.)*
20+ hours of work at my rate of pay of $250/hr

☒ *Check here if you need more space. Attach one sheet of paper or form MC-031 and write "SC-100, Item 3" at the top.*

| Plaintiff *(list names):* | Case Number: |
|---|---|
| Centerpointe Lending Student Loans Services | SMCFS1802430 |

**(4)** **You must ask the defendant (in person, in writing, or by phone) to pay you before you sue. If your claim is for possession of property, you must ask the defendant to give you the property. Have you done this?**

☐ Yes    ☒ No      If no, explain why not:

Defendant stated that he would not believe any documentation I would provide, and would sue

if I did not pay him $4500, I do not believe a demand would be considered

**(5)** **Why are you filing your claim at this courthouse?**

**This courthouse covers the area** *(check the one that applies):*

a. ☒ (1) Where the defendant lives or does business.
       (2) Where the plaintiff's property was damaged.
       (3) Where the plaintiff was injured.

    (4) Where a contract (written or spoken) was made, signed, performed, or broken by the defendant *or* where the defendant lived or did business when the defendant made the contract.

b. ☐ Where the buyer or lessee signed the contract, lives now, or lived when the contract was made, if this claim, is about an offer or contract for personal, family, or household goods, services, or loans. *(Code Civ. Proc., § 395(b).)*

c. ☐ Where the buyer signed the contract, lives now, or lived when the contract was made, if this claim is about a retail installment contract (like a credit card). *(Civ Code, § 1812.10.)*

d. ☐ Where the buyer signed the contract, lives now, or lived when the contract was made, or where the vehicle is permanently garaged, if this claim is about a vehicle finance sale. *(Civ Code, § 2984.4.)*

e. ☐ Other *(specify):* _____

**(6)** **List the zip code of the place checked in ⑤ above** *(if you know):* 91710

**(7)** **Is your claim about an attorney-client fee dispute?** ☐ Yes    ☒ No
*If yes, and if you have had arbitration, fill out form SC-101, attach it to this form, and check here:* ☐

**(8)** **Are you suing a public entity?** ☐ Yes    ☒ No
*If yes, you must file a written claim with the entity first.* ☐ A claim was filed on *(date):* _____
*If the public entity denies your claim or does not answer within the time allowed by law, you can file this form.*

**(9)** **Have you filed more than 12 other small claims within the last 12 months in California?**
☐ Yes    ☒ No    *If yes, the filing fee for this case will be higher.*

**(10)** **Is your claim for more than $2,500?**    ☒ Yes    ☐ No
*If yes, I have not filed, and understand that I cannot file, more than two small claims cases for more than $2,500 in California during this calendar year.*

**(11)** **I understand that by filing a claim in small claims court, I have no right to appeal this claim.**

I declare, under penalty of perjury under California State law, that the information above and on any attachments to this form is true and correct.

Date: **04/09/2018**    Jeffrey Silhanek          ▶ ELECTRONICALLY DELIVERED

            *Plaintiff types or prints name here*          *Plaintiff signs here*

Date: _____

            *Second plaintiff types or prints name here*          *Second plaintiff signs here*

**Requests for Accommodations**

Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the trial. Contact the clerk's office for form MC-410, *Request for Accommodations by Persons With Disabilities and Response. (Civ. Code, § 54.8.)*

http://turbocourt.com/

## SC-100 — Information for the defendant (the person being sued)

**"Small claims court"** is a special court where claims for $10,000 or less are decided. Individuals, including "natural persons" and sole proprietors, may claim up to $10,000. Corporations, partnerships, public entities, and other businesses are limited to claims of $5,000. (See below for exceptions.*) The process is quick and cheap. The rules are simple and informal. You are the *defendant*—the person being sued. The person who is suing you is the *plaintiff*.

**Do I need a lawyer?** You may talk to a lawyer before or after the case. But you *may not* have a lawyer represent you in court (unless this is an appeal from a small claims case).

**How do I get ready for court?** You don't have to file any papers before your trial, unless you think this is the wrong court for your case. But bring to your trial any witnesses, receipts, and evidence that supports your case. And read "Be Prepared for Your Trial" at *www.courts.ca.gov/smallclaims/prepare.*

**What if I need an accommodation?** If you have a disability or are hearing impaired, fill out form MC-410, *Request for Accommodations*. Give the form to your court clerk or the ADA/Access Coordinator.

**What if I don't speak English well?** Ask the court clerk as soon as possible if your court has a court-provided interpreter available and how to request one. A court-provided interpreter may not be available. Alternatively, you may bring an adult who is not a witness or an attorney to interpret for you or ask the court for a list of interpreters for hire.

**Where can I get the court forms I need?** Go to any courthouse or your county law library, or print forms at *www.courts.ca.gov/smallclaims/forms.*

**What happens at the trial?** The judge will listen to both sides. The judge may make a decision at your trial or mail the decision to you later.

**What if I lose the case?** If you lose, you may appeal. You'll have to pay a fee. (Plaintiffs cannot appeal their own claims.)

- If you were at the trial, file form SC-140, *Notice of Appeal*. You must file within 30 days after the clerk hands or mails you the judge's decision (judgment) on form SC-200 or form SC-130, *Notice of Entry of Judgment*.
- If you were not at the trial, fill out and file form SC-135, *Notice of Motion to Vacate Judgment and Declaration*, to ask the judge to cancel the judgment (decision). If the judge does not give you a new trial, you have 10 days to appeal the decision. File form SC-140.

For more information on appeals, see *www.courts.ca.gov/smallclaims/appeals.*

**Do I have options?**
Yes. If you are being sued, you can:

- **Settle your case before the trial.** If you and the plaintiff agree on how to settle the case, the plaintiff must file form CIV-110, *Request for Dismissal*, with the clerk. Ask the Small Claims Advisor for help.

- **Prove this is the wrong court.** Send a letter to the court *before* your trial explaining why you think this is the wrong court. Ask the court to dismiss the claim. You must serve (give) a copy of your letter (by mail or in person) to all parties. (Your letter to the court must say you have done so.)

- **Go to the trial and try to win your case.** Bring witnesses, receipts, and any evidence you need to prove your case. To have the court order a witness to go to the trial, fill out form SC-107 (*Small Claims Subpoena*) and have it served on the witness.

- **Sue the person who is suing you.** If you have a claim against the plaintiff, and the claim is appropriate for small claims court as described on this form, you may file *Defendant's Claim* (form SC-120) and bring the claim in this action. If your claim is for *more* than allowed in small claims court, you may still file it in small claims court if you give up the amount over the small claims value amount, or you may file a claim for the full value of the claim in the appropriate court. If your claim is for more than allowed in small claims court *and* relates to the same contract, transaction, matter, or event that is the subject of the plaintiff's claim, you may file your claim in the appropriate court and file a motion to transfer the plaintiff's claim to that court to resolve both matters together. You can see a description of the amounts allowed in the paragraph above titled "**Small Claims Court.**"

- **Agree with the plaintiff's claim and pay the money.** Or, if you can't pay the money now, go to your trial and say you want to make payments.

- **Let the case "default."** If you don't settle and do not go to the trial (default), the judge may give the plaintiff what he or she is asking for plus court costs. If this happens, the plaintiff can legally take your money, wages, and property to pay the judgment.

**What if I need more time?**
You can change the trial date if:

- You cannot go to court on the scheduled date (you will have to pay a fee to postpone the trial), *or*
- You did not get served (receive this order to go to court) at least 15 days before the trial (or 20 days if you live outside the county), *or*
- You need more time to get an interpreter. One postponement is allowed, and you will not have to pay a fee to delay the trial.

Ask the Small Claims Clerk about the rules and fees for postponing a trial. Or fill out form SC-150 (or write a letter) and mail it to the court *and* to all other people listed on your court papers before the deadline. Enclose a check for your court fees, unless a fee waiver was granted.

 **Need help?**
Your county's Small Claims Advisor can help for free.

Small Claims Advisor
For hours and locations please call:
(909) 708-8606
Or go to *www.courts.ca.gov/smallclaims/advisor.*

* Exceptions: Different limits apply in an action against a defendant who is a guarantor. (See Code Civ. Proc., § 116.220(c).)

http://turbocourt.com/

## SC-100 Información para el demandado (la persona demandada)

La **"Corte de reclamos menores"** es una corte especial donde se deciden casos por $10,000 o menos. Los individuos, o sea las "personas físicas" y los propietarios por cuenta propia, pueden reclamar hasta $10,000. Las corporaciones, asociaciones, entidades públicas y otras empresas solo pueden reclamar hasta $5,000. (Vea abajo para las excepciones.*) El proceso es rápido y barato. Las reglas son sencillas e informales. Usted es el Demandado—la persona que se está demandando. La persona que lo está demandando es el Demandante.

**¿Necesito un abogado?** Puede hablar con un abogado antes o después del caso. Pero no puede tener a un abogado que lo represente ante la corte (a menos que se trate de una apelación de un caso de reclamos menores).

**¿Cómo me preparo para ir a la corte?** No tiene que presentar ningunos papeles antes del juicio, a menos que piense que ésta es la corte equivocada para su caso. Pero lleve al juicio cualquier testigos, recibos y pruebas que apoyan su caso. Y lea "Esté preparado para su juicio" en www.courts.ca.gov/reclamosmenores/prepararse.

**¿Qué hago si necesito una adaptación?** Si tiene una discapacidad o tiene impedimentos de audición, llene el formulario MC-410, Request for Accomodations. Entregue el formulario al secretario de la corte o al Coordinador de Acceso/ADA de su corte.

**¿Qué pasa si no hablo bien inglés?** Pregúntele al secretario de la corte lo más pronto posible si en el juzgado habrá un intérprete disponible y cómo solicitarlo. No siempre están disponibles los intérpretes de la corte. Otra opción es llevar a un adulto que pueda interpretar para usted siempre que esa persona no sea un testigo ni un abogado. O puede pedir a la corte una lista de intérpretes particulares disponibles para contratar.

**¿Dónde puedo obtener los formularios de la corte que necesito?** Vaya a cualquier edificio de la corte, la biblioteca legal de su condado, o imprima los formularios en www.courts.ca.gov/ smallclaims/forms (página está en inglés).

**¿Qué pasa en el juicio?** El juez escuchará a ambas partes. El juez puede tomar su decisión durante la audiencia o enviársela por correo después.

**¿Qué pasa si pierdo el caso?** Si pierde, puede apelar. Tendrá que pagar una cuota. (El Demandante no puede apelar su propio reclamo.)

- Si estuvo presente en el juicio, llene el formulario SC-140, Aviso de apelación (Notice of Appeal). Tiene que presentarlo dentro de 30 días después de que el secretario le entregue o envíe la decisión (fallo) del juez en el formulario SC-200 o SC-130, Aviso de publicación del fallo (Notice of Entry of Judgment).
- Si no estuvo en el juicio, llene y presente el formulario SC-135, Aviso de petición para anular el fallo y Declaración para pedirle al juez que anule el fallo (decisión). Si la corte no le otorga un nuevo juicio, tiene 10 días para apelar la decisión. Presente el formulario SC-140.

Para obtener más información sobre las apelaciones, vea www. courts.ca.gov/reclamosmenores/apelaciones.

**¿Tengo otras opciones?** Sí. Si lo están demandando, puede:

- **Resolver su caso antes del juicio.** Si usted y el Demandante se ponen de acuerdo en cómo resolver el caso, el Demandante tiene que presentar el formulario CIV-110, Solicitud de desestimación (Request for Dismissal) ante el secretario de la corte. Pídale al Asesor de Reclamos Menores que le ayude.

- **Probar que es la corte equivocada.** Envíe una carta a la corte antes del juicio explicando por qué cree que es la corte equivocada. Pídale a la corte que despida el reclamo. Tiene que entregar (dar) una copia de su carta (por correo o en persona) a todas las partes. (Su carta a la corte tiene que decir que hizo la entrega.)

- **Ir al juicio y tratar de ganar el caso.** Lleve testigos, recibos y cualquier prueba que necesite para probar su caso. Si desea que la corte emita una orden de comparecencia para que los testigos vayan al juicio, llene el formulario SC-107, Citatorio de reclamos menores (Small Claims Subpoena) y entrégueselo legalmente al testigo.

- **Demandar a la persona que lo demandó.** Si tiene un reclamo contra el Demandante, y el reclamo se puede presentar en la corte de reclamos menores, tal como se describe en este formulario, puede presentar el formulario SC-120, Reclamo del demandado (Defendant's Claim) y presentarlo en este mismo caso. Si su reclamo excede el límite permitido en la corte de reclamos menores, puede igualmente presentarlo en la corte de reclamos menores si está dispuesto a limitar su reclamo al máximo permitido, o puede presentar un reclamo por el monto total en la corte apropiada. Si su reclamo excede el límite permitido en la corte de reclamos menores y está relacionado con el mismo contrato, transacción, asunto o acontecimiento que el reclamo del Demandante, puede presentar su reclamo en la corte apropiada y presentar una moción para transferir el reclamo del Demandante a dicha corte, para poder resolver los dos reclamos juntos. Puede ver una descripción de los montos permitidos en el párrafo anterior titulado "Corte de reclamos menores".

- **Aceptar el reclamo del Demandante y pagar el dinero.** O, si no puede pagar en ese momento, vaya al juicio y diga que quiere hacer los pagos.

- **No ir al juicio y aceptar el fallo por falta de comparecencia.** Si no llega a un acuerdo con el Demandante y no va al juicio (fallo por falta de comparecencia), el juez le puede otorgar al Demandante lo que está reclamando más los costos de la corte. En ese caso, el Demandante legalmente puede tomar su dinero, su sueldo o sus bienes para cobrar el fallo.

**¿Qué hago si necesito más tiempo?** Puede cambiar la fecha del juicio si:

- No puede ir a la corte en la fecha programada (tendrá que pagar una cuota para aplazar el juicio), o
- No le entregaron los documentos legalmente (no recibió la orden para ir a la corte) por lo menos 15 días antes del juicio (ó 20 días si vive fuera del condado), o
- Necesita más tiempo para conseguir intérprete. (Se permite un solo aplazamiento sin tener que pagar cuota para aplazar el juicio).

Pregúntele al secretario de reclamos menores sobre las reglas y las cuotas para aplazar un juicio. O llene el formulario SC-150 (o escriba una carta) y envíelo antes del plazo a la corte y a todas las otras personas que figuran en sus papeles de la corte. Adjunte un cheque para pagar los costos de la corte, a menos que le hayan dado una exención.

 **¿Necesita ayuda?** El Asesor de Reclamos Menores de su condado le puede ayudar sin cargo.

Small Claims Advisor

For hours and locations please call:

(909) 708-8606

O visite www.courts.ca.gov/reclamosmenores/asesores.

* **Excepciones:** Existen diferentes límites en un reclamo contra un garante. (Vea el Código de Procedimiento Civil, sección 116.220 (c).)

**Reclamo del Demandante y ORDEN**
**Para Ir a la Corte de Reclamos Menores**
**(Reclamos Menores)**

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**ATTACHMENT Page __1__ of __1__**

1
To: Form SC-100 - Plaintiff's Claim and Order to Go to Small Claims Court

2 **SC-100, Item 3 - Additional Claim Information**

3   Why does the Defendant owe the Plaintiff money?

4   Defendant claims that my company made illegal phone calls to his cell phone. I told

5   him that I would produce documentation proving his online inquiry to receive those

6   calls. And that we have only placed 2 calls to his cell phone and left messages both

7   times. He said that information would be "fake" and he is going to sue me if I do not

8   pay him $4,500, and that he does this all the time, so it would be cheaper for me to

9   settle than to go to court. I am suing Under California Penal Code Section 518 PC,

10  Extortion. And Abuse of Process.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  *(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [New July 1, 2002]

**ATTACHMENT
to Judicial Council Form**

Cal. Rules of Court, rule 982

**EXHIBIT B**

## FRANKLIN COUNTY MUNICIPAL COURT
### SMALL CLAIMS DIVISION

FILED

Case No. _____ CV I _____

**2018 JAN 23 PM 1: 15**

FRANKLIN COUNTY
MUNICIPAL COURT
LORI M. TYACK

Ken Johansen
5202 Avery Oak Dr.
Dublin, OH 43016

614-791-1037

Centerpointe Lending Student Loan Services
Attn:  Jeff Silhanek
11800 Central Avenue #225
Chino, CA 917110

| Plaintiff(s) Name, Address, ZIP Code, Telephone Numbers | Defendant(s) Name, Address, ZIP Code, Telephone Numbers |
|---|---|

(1) Has this dispute been to mediation?   [ ] Yes   [x] No

(2) Is the Defendant currently in the United States Military Service?   [ ] Yes   [x] No

(3) The Summons (Defendant's Notice of the Complaint) will be sent by certified mail.  If you waive notice of failed service and the certified mail is returned as "Refused" or "Unclaimed," the Court will resend by ordinary mail and set a new trial date.  Do you want to waive notice of failed service? [x] Yes   [ ] No

### COMPLAINT

On November 2, 2017 at 11:45AM the plaintiff received a prerecorded message on his cellular telephone (614)531-1022. The plaintiff registered this number on the National Do Not Call list September 2, 2014.  To identify the caller the plaintiff responded to the prerecorded message and was connected with Johnny. Johnny offered the plaintiff refinancing on a student loan and stated that he worked for Centerpointe Lending Student Loan Services.

The defendant's caller Id on November 2 was (614)810-0719.  This is a central Ohio area code and a non-working number. The defendant failed to identify his company until more than 5 minutes into the call.  The plaintiff believes the defendant wanted to keep his identity secret because he knows he was violating the Telephone Consumer Protection Act regulations. The plaintiff mailed a letter on November 6, 2017 requesting evidence of his consent to receive telemarketing calls from the defendant.  As evidence of the plaintiff's consent the defendant provided data containing the plaintiff's phone number that was entered on what the plaintiff believes is a Columbian website (http://studenthelplinesupport.pagedemo.co) with the name Christine Freitas with a Eugene, Oregon address and a non-working e-mail address of christinerfreitas@teleworm.us. The defendant admitted that consent information he offered was supplied by a third party that he hired and is probably "fake".

The defendant violated 47USC§227(b)(1)(A)(iii) using an artificial or pre-recorded voice. The defendant knowingly violated the statute as shown by his concealing his identity during the phone call and is subject to triple damages per 47USC§227(b)(3)(B).  The plaintiff requests $1500 ($500 x 3) in damages .

*Please use an additional page if necessary.*

Plaintiff demands judgment against Defendant in the sum of $ 1500.00 _____, plus court costs and interest.

### COMPLAINANT'S OATH

Ken Johansen
_____ (print first and last name), is
(check one)  [x] Plaintiff   [ ] Plaintiff's attorney   [ ] an officer or salaried employee of the Plaintiff corporation.  Complainant also states the following:

**"I declare under penalty of law that this Complaint is true and correct to the best of my knowledge."**

Signature: _____   Date: 1-23-18
Plaintiff, Plaintiff's attorney, or Plaintiff's officer or salaried employee.

Attorney Registration #: _____

# FRANKLIN COUNTY MUNICIPAL COURT
## SMALL CLAIMS DIVISION
### COLUMBUS, OHIO

18 APR -2 AM 9:36

KEN JOHANSEN
*Plaintiff(s)*

v.

FRANKLIN COUNTY
MUNICIPAL COURT  Case No. 2018 CVI 002975
LORI M. TYACK

CENTERPOINTE LENDING STUDENT LOAN SERVICES :
*Defendant(s)*

### MAGISTRATE'S DECISION

☒ Case called for trial at _2.20_ P.M. Plaintiff in court. Defendant(s) failed to appear when called. Judgment for plaintiff in the amount of $ _1500._ _00_ , plus court costs, and interest at the rate of _4_ % per annum from the date of judgment.

❑ Case called for trial at _____ P.M. Plaintiff failed to appear. Defendant(s) appeared and denied liability. Judgment for defendant(s). Case dismissed at plaintiff's costs.

❑ Case called for trial at _____ P.M. No one appeared. Case dismissed at plaintiff's costs.

❑ All parties appeared. Defendant(s) appeared and admitted liability and damages in the amount claimed. Judgment for plaintiff in the amount of $_____, plus court costs, and interest at the rate of ___% per annum from the date of judgment.

❑ By agreement of the parties, judgment for plaintiff in the amount of $_____, plus costs, and interest at the rate of ____% per annum from the date of judgment.

❑ According to the information supplied by the plaintiff, case settled. Case dismissed without prejudice at plaintiff's costs.

❑ Other:_____

_____

_____

_____, an officer or salaried employee of the _____
corporation was permitted to appear on behalf of such corporation, subject to the limitations imposed by R.C. 1925.17.

_3·28·18_

Date

_____
Magistrate

A party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law contained in this decision unless the party timely and specifically objects to that finding or conclusion. Civ. R. 53(D)(3).

SCJ.FRM 3/3/2009

# FRANKLIN COUNTY MUNICIPAL COURT
## COLUMBUS, OHIO

FILED

18 APR -2 AM 9: 36

FRANKLIN COUNTY
MUNICIPAL COURT
LORI M TYACK

KEN JOHANSEN
*Plaintiff(s)*

v.

Case No. 2018 CVI 002975

CENTERPOINTE LENDING STUDENT LOAN SERVICES
*Defendant(s)*                                   :

### JUDGMENT ENTRY

In accordance with Civil Rule 53, the court hereby adopts the Magistrate's Decision filed herein and enters judgment as set forth below.

Judgment for plaintiff in the amount of $ 1,500.00 plus court costs, and interest at the rate of 4 % per annum from this date.

❏   Judgment for defendant on counterclaim in the amount of $_____, plus court costs and interest at the rate of _____% per annum from this date.

❏   Judgment for defendant on the complaint; case dismissed with prejudice at plaintiff's costs.

❏   Case dismissed without prejudice at plaintiff's costs.

❏   Other:_____

_____

❏   The Magistrate's Decision is modified and judgment rendered as follows:_____

_____

Pursuant to Rule(s) 53(D) and 58 of the Ohio Rules of Civil Procedure, the court hereby directs the Clerk of Franklin County Municipal Court to serve upon all parties notice of this judgment and its date of entry upon the journal.

MAR 30 2018
Date

_____
Judge

SCJ.FRM 1/2007

## VENDOR SERVICES AGREEMENT

This Vendor Services Agreement (the "Agreement"), dated as of the date on which it is executed by the Parties (the "Effective Date"), is made by and between **Centerpointe Lending Student Loan Services**, a corporation ("XX") whose principal business is located at **11800 Central Ave #225, Chino, CA 91710** and **Ivault Services Phil, Inc,** a Philippine corporation ("Contractor") whose principal place of business is located at Block 22, Lot 12-13 La Aldea Buena Mactan, Timpolok Road, Babag Lapu-lapu City 6015, Cebu, Philippines, each of XX and Contractor, is separately a ("Party") or together are the ("Parties").

## I.    **Explanatory Statement and Initial Definitions**

A.    XX, is engaged in the business of marketing and selling various products and services to consumers (the "Business") and desires to market its Business to consumers.

B.    Contractor is in the business of sourcing consumers (each, a "Prospect") who have confirmed an interest in purchasing the Business through XX and/or its affiliate or customer.

C.    Contractor is willing to generate "Billable Leads" for the Business for XX in the manner and on the terms and conditions specified herein as well as the Order attached hereto. A "Billable Lead" means any Prospect who meets the Order Details as outlined in each Order (as further defined below and in Exhibit A). Provided that the following additional criteria is met:

i)    The Billable Lead is generated by Contractor exclusively for XX in compliance with all Applicable Laws;

ii)    All required fields are completed by the consumer as specified by the Order;

iii)    The Billable Lead is not a duplicate of a lead previously generated or received for the same product or service from any source;

iv)    The Billable Lead does not contain any material errors or misinformation in, without limitation, the consumer's name, mailing address, email address and/or telephone number;

v)    The Billable Lead is that of a legitimate consumer located within the territory specified in the Order that is genuinely interested in the third-party product or service, resides within the area specified in the Order and is not computer generated (e.g., a robot, spider, computer script or other automated, artificial or fraudulent method designed to appear like an individual consumer);

vi)    Neither Contractor nor any its affiliates or contractors will impose, charge, or allow fees to be charged to consumers in connection with any Billable Lead;

vii)    Neither Contractor nor any its affiliates or contractors generated the Billable Lead using incentives, rewards, co-registration paths or any improper or artificial conduct, nor did Contractor enlist or encourage any third party to do so on its behalf;

1

viii)     The Billable Lead and corresponding contact information are not deemed to be invalid or fraudulent;

ix)     The Billable Lead is not rejected for any reason at time of post or time of submission to XX;

x)     If the Billable Lead dials a telephone number provided to Contractor by XX, said telephone call meets or exceeds the minimum time duration as specified in the Order;

xi)     The consumer expressly and lawfully opted-in, as specified in the Order, to receiving a telephone phone call email, text message, short message, direct mail and/or other communication from XX, a designated XX affiliated entity and/or designated third-party product/service providers; and

xii)     Billable Lead Information is captured and logged in the XX lead management system (the "Lead Management System").

D.     This particular product or service ("Marketed Product/Service") being marketed will be identified on the Order attached hereto as Exhibit A.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## II.     Agreement

**1. Engagement.** XX hereby engages and authorizes Contractor to provide Prospects to XX for the Business as further detailed herein and in insertion orders mutually agreed to by the Parties and attached hereto from time to time as Exhibit A ("Order"). In the event of a conflict between the terms contained in any Order and this Agreement, the Order shall govern. Terms are defined throughout the text of this Agreement and shall have the meanings respectively assigned to them.

In connection with its performance of the Services, Contractor shall diligently seek to obtain potential customer Billable Leads for the sale of the Marketed Product/Service. The method of marketing (e.g., telephone, email, text, short message, direct mail, websites, targeted internet advertising, etc.) shall be conducted by Contractor in the manner specified in the Order. All Billable Leads shall by submitted be Contractor to XX via the method detailed in Orders. Contractor will submit those Billable Leads to XX as soon as reasonably practical after generated.

**2. Term.** The term of this Agreement shall commence on the Effective Date and continue for one (1) year. Provided that:

A.     This Agreement may be subject to termination: (i) if either Party hereto defaults on any of its material obligations, representations or warranties under this Agreement and the non-defaulting Party shall have notified the other Party in writing, specifying in sufficient details the nature and extent of such breach and the defaulting Party shall not have remedied the default

2

within fifteen (15) calendar days thereafter;

     B.     This Agreement will automatically terminate in the event either Party files bankruptcy, undergoes an assignment for the benefit of creditors, has a receiver appointed to conduct its affairs, or is dissolved or liquidated;

     C.     XX may terminate this Agreement upon thirty (30) calendar days notice in the event that the client to whom it is providing the marketing campaign with the Billable Leads terminates its agreement with XX; or

     D.     XX may terminate this Agreement upon seven (7) calendar days notice if Contractor fails to provide the minimum number of Billable Leads and/or provides more than the maximum number of Billable Leads for five (5) or more business days out of any ten (10) business day period; or

     E.     XX may terminate this agreement immediately in the event that Contractor, or any subcontractor engaged by Contractor to provide services under this Agreement, becomes subject to any governmental investigation, action or proceeding, or any civil litigation, regarding its generation of leads, methods of contacting consumers, collection and handling of consumer information or data, licenses, or business practices

**3. General Compliance.** All Billable Leads must be generated in compliance with applicable Law such that

     (i)  Contractor has valid legal permission to share Billable Leads with XX

     (ii) XX and its business partners and clients have valid legal permission to contact such Billable Leads via email and telephone (including, without limitation, using an automated or predictive dialer to call any Billable Leads, texts, pre-recorded messages or automated messages to such Billable Leads) and/or other method specified in the Order for purposes of marketing the products and/or services of XX or its affiliate or customer to such Billable Leads and

     (iii) Upon two (2) business days written notice, Contractor shall provide applicable proof that any Billable Lead validly and legally opted in to be contacted by XX (via email, telephone and direct mail or other specified method) regarding XX's or its affiliate's or customer's products and services.

Notwithstanding the foregoing, Contractor shall record any telephone calls with any Billable Lead where the Billable Lead provides valid consent to be contacted by XX and shall store such recording for at least five (5) years from the date of call. In addition, for any Billable Lead generated through online channels, Contractor shall use a Billable Lead generation compliance service at its own expense, such as PageID, LeadID or TrustedForm, to capture and verify that any Billable Lead validly and legally consent to being contacted by XX and store such information for at least five (5) years from the date the Billable Lead consented to be contacted.

Contractor shall notify XX in writing within two (2) business days if it learns in any way that it or any of its subcontractors providing services under this Agreement becomes subject to any governmental investigation, action or proceeding, or any civil litigation, regarding its generation of leads, methods of contacting consumers, collection and handling of consumer information or data, licenses, or business practices. Contractor agrees to promptly provide XX with a copy of any

notices received from any governmental agency of any such investigation, action or proceeding.

**4. Affirmative Consent.** Unless otherwise expressly specified in the Order, Contractor shall collect all affirmative consents by consumers required for the method of marketing being conducted on behalf of XX that is specified in the Order. Unless otherwise expressly specified, Contractor shall collect legally compliant express written consents from consumers for receipt of telephone calls, text messages, and short messages, including through use of an automated phone dialing system and/or use of an artificial or prerecorded voice, as well as legally compliant express written consents for receipt of emails, direct mail and other forms of advertising. To the full extent required by law, XX's name shall be added to Contractor's opt-in form, privacy policies, terms and conditions, disclosures, and related documents and agreements with consumers.

In the event that XX requests Contractor to conduct the marketing on behalf of an affiliated company, XX dba, or one or more of XX's clients or third party goods or service providers, then such affirmative consents shall be obtained on behalf of the affiliated company, client or provider, and, to the fullest extent required by law, such affiliated company, client or provider shall be named in and added to Contractor's opt-in form, privacy policies, terms and conditions, disclosures, and related documents and agreements with consumers.

In the event that Contractor subcontracts any of its obligations hereunder, or Contractor purchases data or leads from third parties, Contractor shall ensure that its subcontractor or the person or entity from whom it is acquiring the data or leads performs the obligations specified herein, including, without limitation, ensuring that the subcontractor or data provider obtains the legally valid affirmative consents and that XX's name or the name of its affiliate or customer be added to the subcontractor's or data provider's opt-in form, privacy policies, terms and conditions, disclosures, and related documents and agreements with consumers.

Contractor shall maintain copies of such affirmative consents from consumers for a minimum of five years, and Contractor shall promptly supply copies of such consents to XX upon request by XX.

**5. Content Compliance.** Contractor represents and warrants that it and its agents/affiliates/Sub-Contractors (the "Affiliate" or "Affiliates") shall comply with all applicable federal, state and local statutes, law, regulations, rules, judgments, orders and decrees applicable to it, relating to XX's marketing and advertising activities under this Agreement, including, without limitation, any online or offline advertising and marketing materials and methods used to generate and/or qualify Billable Leads. Contractor shall (i) be solely liable for all marketing materials used in connection with this Agreement, (ii) ensure that all marketing materials comply with applicable Law at all times, and (iii) not make any material misstatements or omissions in any marketing materials as it relates to the applicable marketing offer.

Contractor shall not (i) engage in the practice of search engine "spamming" (i.e., the inappropriate use of search engine optimization tactics such as doorway pages or cloaking); (ii) use any spyware, adware, trojans, viruses, worms, spybots, keyloggers or any other form of malware; (iii) provide any Billable Lead with any incentive or compensation to become a Billable Lead; or (iv) use any website or other advertising content that contains any (1) pornographic or offensive material, (2)

4

software trading, hacking or phreaking content, (3) illegal music reproduction, downloads or content, (4) content that infringes on any copyright, patent, trademark or service mark, trade secret rights or any other personal, moral, contract, property or privacy right of any third party, or (5) any other illegal or defamatory content.

All emails generated for an email marketing campaign shall contain a legally compliant opt-out button that links to a website that unsubscribes the consumer from the lead database and that promptly ceases the transmittal of emails to such consumer. All automated phone calls and text messages shall provide an opt-out procedure if and as required by applicable law. All data bases must be scrubbed of consumers that opt-out of receiving further emails, texts, calls or other communications.

6. **Compliance with Laws**. Contractor represents and warrants to XX that: (i) Contractor will exercise reasonable care in generating the Billable Leads and will strictly comply with any and all foreign, federal, state, or local laws, rules, regulations, ordinances, guidelines, judicial and administrative orders in effect or hereafter enacted, adopted or amended, that apply to its business or performance under this Agreement, including, without limitation, those governing maximum interest rate caXX, the CAN-SPAM Act of 2003 (as amended), California Business & Professions Code §17529, the Federal Telemarketing Sales Rules (including, without limitation, the Telemarketing Sales Rule (16 C.F.R. Part 310)), the Telephone Consumer Protection Act (42 U.S.C. § 227), provisions relating to the National Do Not Call Registry (16. C.F.R. Part 310) and applicable state Do Not Call List requirements, the Truth-in-Lending Act (15 U.S.C. § 1601 et seq.), the Equal Credit Opportunity Act (15 U.S.C. § 1691 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et seq.) and regulations promulgated thereunder, Section 5 of the Federal Trade Commission Act, all state and federal privacy laws and consumer data laws, and state unfair and deceptive acts and practices prohibitions applicable to Contractor's products or services or Contractor's performance hereunder (collectively, "Applicable Laws"); (ii) Contractor will not violate the rights of any third-party including, without limitation, infringement or misappropriation of any copyright, patent, trademark, trade secret or other proprietary/intellectual property right; (iii) Contractor's products and/or services will not target consumers under the age of eighteen (18); (iv) neither Contractor, nor any employee or affiliate of Contractor, is or has been under any investigation or fined by the Federal Trade Commission or any other governmental agency; (v) Contractor has implemented all reasonable and necessary protocols to preclude unfair, deceptive and abusive lending practices, including, without limitation, abusive collections practices; (vi) Contractor shall only utilize consumer information as contemplated hereunder and in furtherance of the provision of Contractor's products/services; and (vii) Contractor will not represent to consumers that XX has sponsored or approved any financial services and products offered to consumers.

7. **Privacy and Security**. Contractor shall implement such administrative, physical, and technical security measures as required by Applicable Laws and/or as otherwise necessary to: (a) ensure the secure handling, transmission, storage, and disposal of any/all consumer information and data which Contractor holds or handles; (b) protect against any threats or hazards to the security and integrity of such consumer information and data; (c) protect against any unauthorized access to or use of such consumer information and data; (d) use commercially reasonable efforts to cause its permitted transferees to exercise all due care with respect to all consumer information and the

5

collection, handling, delivery, processing and transmission thereof, including, without limitation, with respect to confidentiality and security, as well as any consent or authorization necessary to use such information as contemplated hereby; and (e) comply, and use commercially reasonable efforts to cause its permitted transferees to comply with all Applicable Laws with respect to their possession and use of any consumer information and data (including, without limitation, the use, unauthorized access, confidentiality and security of consumer information, and procedures related to the foregoing).

Contractor shall notify XX within two business days of any unauthorized disclosure to, or access by, a third party of any non-public personal information of a consumer gathered pursuant to a pursuant to this Agreement. Contractor shall fully disclose in writing the full extent of such disclosure or access of consumer information or data. Contractor shall immediately at its own expense take all steXX necessary to prevent further unauthorized disclosure or access to such non-public consumer information. Contractor also agrees at its own expense to promptly retrieve the non-public personal information of the consumer if possible and/or mitigate the effects of the unauthorized disclosure or access. Upon request, Contractor will provide reasonably satisfactory evidence to XX of Contractor's compliance with this entire section, including, without limitation, the security procedures outlined in the foregoing paragraph.

**8. Contractor Duties Regarding Leads and Creatives.** Contractor shall provide exclusive opt-in Billable Leads for the Marketed Product/Service to XX from any consumer who meets the Billable Lead requirements as stated in each Order and who has requested information or is otherwise interested in receiving a quote or consultation about the Marketed Product/Service. Such Billable Leads will not be provided to any other person or entity.

In the event that Contractor creates any advertising or marketing materials ("Creatives"), including but not limited to, emails and mailings, such Creatives must be submitted to XX for prior written approval before commencing any campaigns, including, but not limited to, mailers, registration forms, from lines, subject lines, commercial email header information, emails, headlines, text links, images, logos, banners, creative, scripts, advertising materials and ad text copy.

In the event that XX creates the advertising or marketing materials, then Contractor may only use that Creative and may not modify or change it any manner. Contractor will use the Creative, as well as the tradenames, logos, trademarks, text, images, banners, links, domain names, phone numbers therein, only for purposes of performing its services for XX under this Agreement and only for so long as Contractor is performing such services. Contractor agrees not to claim any of its own rights in such Creatives and information therein, and Contractor agrees to take no actions that infringe upon or denigrate XX's ownership of and goodwill in such Creatives and information therein.

Only Creatives that have been provided and/or pre-approved by XX may be used by Contractor. XX reserves the right to withhold or refuse approval of any such Creatives for any reason whatsoever in XX's sole discretion. Contractor shall not alter, modify or otherwise change any approved Creatives without XX's prior express written consent. Contractor must immediately comply with any and all requests by XX to modify, alter, remove or otherwise change the

6

positioning, placement, frequency and other editorial decisions related to the Creatives. If Contractor disseminates any Creatives not approved by XX, Contractor shall forfeit all Billable Lead fees and may be subject to further liability.

**9. Compensation.** Invoicing and payment for Billable Leads shall be pursuant to the terms detailed individually in each Order. Contractor will be paid an agreed upon fee for accepted Billable Leads as set forth in and/or specified in the Order. XX's obligation to pay the lead fees is conditioned upon such Billable Leads meeting all of the terms of this Agreement and acceptance of the Billable Leads by XX. The final determination of whether or not a lead is a valid Billable Lead shall be made by XX in its reasonable discretion.

Payouts will be based on XX's reasonable calculation of the number of valid Billable Leads. Contractor must notify XX of any disputes, in writing and in commercially reasonable and verifiable detail, within ten (10) business days of receiving any and all payments. Contractor's failure to timely and properly dispute a payment shall be considered an irrevocable waiver to object to such payment and agreement to XX's determination as to whether or not a lead is a valid Billable Lead and XX's calculation of the amount payable to Contractor. XX shall have the right to offset against payments owed to Contractor, withhold and freeze any unpaid payments due to Contractor, or charge back payments to Contractor's account, if XX determines, in its reasonable discretion, that Contractor has violated this Agreement.

**10. Method of Provision of Services.** With respect to any inbound or outbound telemarketing services provided by Contractor or its Affiliate under this Agreement, Contractor shall (1) provide the name, address, and contact person for every Affiliate providing the telemarketing services; (2) provide a list of all caller ID's and Subscription Account Numbers used by each telemarketing services Affiliate in advance; (3) only use telemarketing scripts that have been pre-approved in writing by XX; (4) sign and comply with the Telemarketing Vendor Protocols (the "Protocols") attached hereto as Exhibit B; and (5) require all Affiliates who tele-market to sign and comply with the Protocols, with executed copies of the Protocols sent to XX upon request by XX.

With respect to any electronic mail services used by Contractor under this Agreement, Contractor shall (1) provide the name and email address for every sender of the emails; (2) provide the domain name and IP address of the website from which the @ address is specified on the emails; (3) only use email texts and logos that have been pre-approved in writing by XX, and (4) require all Subcontractors who transmit emails to sign and comply with the requirements specified in this Agreement.

With respect to any other method of generating Billable Leads used by Contractor under this Agreement, Contractor shall (1) provide the name and address for every person or entity conducting the marketing; (2) provide the domain name and IP address of the website from which the marketing is being conducted; (3) provide each physical address from which the marketing is being conducted; (4) provide copies of all such marketing; and (4) require all Subcontractors who transmit marketing communications to sign and comply with the requirements specified in this Agreement.

**11. Proprietary Rights/License.** Subject to the terms of this Agreement and XX's written

7

approval, XX offers Contractor a non-exclusive right to integrate with the XX system for, without limitation, delivering and/or posting Billable Lead Information, integration of forms, or delivering phone calls to XX pursuant to this Agreement. Contractor agrees not to modify the XX system, including, without limitation, any computer code, software or URL's in any way without XX's prior written approval.

**12. Third-Party Lead Origination.** If Contractor is permitted under express provision in the Order to offer Billable Leads that have been originated by third-parties, including without limitation sub-publishers ("Third-Party Originators"), then Contractor covenants, represents and warrants with respect to the transfers of any Billable Leads generated by Third-Party Originators as follows:

a) Contractor will exercise reasonable care in determining that Third-Party Originators are businesses properly organized and, as applicable, licensed;

b) Contractor will obtain for the benefit of Contractor, XX and Consumers covenants, representations and warranties from Third-Party Originators that Third-Party Originators will solicit Consumers only in full compliance with the terms of this Agreement and all Applicable Laws;

c) it will shall bind Third-Party Originators to no less restrictive terms as those set forth herein and shall be liable for any breach by Third-Party Originators of any restrictions as specified by this Agreement;

d) Without limiting the generality of subparagraph 12(b) above, Contractor will obtain for the benefit of Contractor, XX and Consumers sufficient covenants, representations and warranties from Third-Party Originators that the Third-Party Originators will comply with all Applicable Laws with respect to their possession and use of any Consumer Information (including, without limitation, the use, unauthorized access, confidentiality and security of Consumer Information, and any procedures related to the foregoing) and all Applicable Laws regarding email marketing and telemarketing activities;

e) Contractor will obtain for the benefit of XX sufficient covenants, representations and warranties from Third-Party Originators that the Third-Party Originators will not represent to Consumers that XX has sponsored or approved of any financial services and products offered to Consumers; and

f) Contractor will maintain records evidencing its process of credentialing Third-Party Originators for a minimum of five (5) years after the transfer of a Billable Lead to XX, and make such records available to XX for inspection upon reasonable prior notice.

**13. Certain Representations, Warrants and Covenants of Contractor.**

(a)    Organization, Good Standing, Corporate Power and Qualification. Contractor is a Corporation or Limited Liability Company qualified to do business and in good standing under the laws of the states in which it is organized and/or is based; it is duly organized, validly existing and has all requisite corporate power and authority required to carry on its business as it relates to

8

its performance under this Agreement; and Contractor is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on the Business or Contractor's obligations hereunder;

(b)     Compliance with Laws; No Governmental Consents and Filings.     XX's engagement of Contractor to perform the services described herein complies in all material respects to all other laws applicable to the Business.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of Contractor or XX in connection with the consummation of the transactions contemplated by this Agreement.

(c)     Permits and Licenses. Contractor has all franchises, permits, licenses and any similar authority necessary for the conduct of the Business and the consummation by Contractor and XX of their respective obligations hereunder, the lack of which could reasonably be expected to have a material adverse effect on the Business or the Party's obligations hereunder. Contractor is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

(d)     No Re-Sale of Billable Leads and No Use of Billable Leads to Sell Other Products. Contractor shall not reuse, resell, transfer or assign any Billable Leads. Contractor shall not use any Billable Leads for any purpose other than for what is directed by XX pursuant to the terms of this Agreement.  In the event that Contractor resells, transfers or assigns any Billable Leads to any third parties in violation of this Agreement, then Contractor shall pay to XX double the amount of money that XX receives from its clients for Billable Leads as a result of the unauthorized transfer of such information.  In the event that Contractor utilizes any Billable Leads to sell any products or services other than what has been instructed by XX in violation of this Agreement, then Contractor shall pay to XX double the Lead Fees that XX ordinarily would have charged had it sold such information to its clients. Contractor acknowledges that XX expends substantial effort and monies developing Billable Leads, which XX entrusts such Billable Leads to Contractor for the purposes of selling the Billable Leads to XX's clients, that XX incurs substantial risk, and that the amount of damages to XX as a result of Contractor's breach of the foregoing provisions would be inherently difficult to determine.  Therefore, Contractor agrees as liquidated damages, and not as a penalty, to pay the aforementioned sums to XX in the event of a breach of these provisions.

**14. Certain Representations, Warrants and Covenants of XX.**

(a)     Organization, Good Standing, Corporate Power and Qualification. XX is a corporation qualified to do business and in good standing under the laws of the State of California; it is duly organized, validly existing and has all requisite corporate power and authority required to carry on its business as it relates to its performance under this agreement; and XX is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on XX's performance obligations hereunder;

(b)     Compliance with all applicable Laws; No Governmental Consents and Filings. XX's agreement to generate Billable Leads for itself and/or its client companies complies in all material respects with all governing laws, and XX agrees to perform all duties required to

9

generate Billable Leads for itself and its client companies in compliance with all applicable laws; no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the XX in connection with the consummation of the transactions contemplated by this Agreement;

(c)     Permits and Licenses. XX and its clients have all franchises, permits, licenses and any similar authority necessary to perform as required under this agreement and to consummate the agreement to perform their respective obligations hereunder, the lack of which could reasonably be expected to have a material adverse effect on XX's performance of its obligations hereunder. XX is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

### 15. Indemnification.

(a)     By XX. XX agrees to defend, indemnify and hold harmless Contractor from and against any and all claims, damages, liabilities, losses, judgments, costs, and attorney fees arising directly out of, or relating to XX's breach of this Agreement, violation of applicable law, gross negligence or willful misconduct in engaging in the marketing and promotional activities described herein. Notwithstanding the foregoing, Contractor shall have the right, in its absolute discretion and at its sole cost, to employ attorneys of its own choice and to institute or defend any claim for which Contractor has a right to be indemnified.

(b)     By Contractor. Contractor agrees to defend, indemnify and hold harmless XX, its directors, officers, members, employees, advertisers, agencies, affiliated companies, parent companies, subsidiaries, sister companies and clients with respect to any third-party claim against any and all claims, damages, liabilities, losses, judgments, costs, and attorney fees arising directly out of, or relating to Contractor's breach of, or Contractor's subcontractor's breach of, this Agreement, violation of applicable law, negligence or misconduct in engaging in its Business or the marketing and promotional activities described herein including, without limitation:

i)      a breach of Contractor's representations, covenants and/or warranties; and/or

(ii)     violation of any/all applicable foreign, federal, state or local laws, rules or regulations (including, without limitation, the CAN SPAM Act of 2003, California's Anti-Spam Act, Cal. Bus. & Prof. Code §§ 17529 et seq. ("California's Anti-Spam Act"), the Telephone Consumer Protection Act ("TCPA"), the Telemarketing Sales Rule ("TSR") and the Federal Trade Commission Act ("FTC Act") including, but not limited to, failure to obtain proper prior express written consents from individuals for use of Billable Lead Information as contemplated by this Agreement); and/or

(iii)    violation of any third-party copyright, patent, trademark or other third-party intellectual property right.

Notwithstanding the foregoing, XX shall have the right, in its absolute discretion and at its sole cost, to employ attorneys of its own choice and to institute or defend any claim for which XX has a right to be indemnified.

**16. Insurance.** Contractor shall at all times maintain errors and omissions liability insurance covering its telemarketing, email marketing and other forms of marketing. Such insurance shall have limits of not less than $1,000,000 per claim and $3,000,000 aggregate. Contractor shall cause XX to be named as an additional insured on its errors and omissions policy for the full term of this Agreement. Contractor shall provide an additional insured endorsement to XX evidencing its status as an additional insurance upon entry into this Agreement and upon renewal each year of its insurance policy.

**17. Limitation of Liability.** XX SHALL NOT BE LIABLE TO CONTRACTOR FOR ANY SPECIAL, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES, OR ANY DAMAGES FOR LOST DATA, BUSINESS INTERRUPTION, LOST PROFITS, LOST REVENUE OR LOST BUSINESS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, HOWEVER CAUSED AND BASED ON ANY THEORY OF LIABILITY, ARISING OUT OF THIS AGREEMENT, WHETHER OR NOT XX HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE, AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

**18. Confidentiality.** Contractor and XX may provide the other with certain information which the Disclosing Party reasonably designates as confidential and proprietary and is being provided to the other solely for use in connection with this Agreement (the "Confidential Information"). The receiving Party shall keep the Confidential Information secret and utilize the Confidential Information only in connection with this Agreement, and shall not otherwise make use, commercial or otherwise, of the Confidential Information without the Disclosing Party's prior written consent. The foregoing confidentiality obligations shall remain in effect and bind the heirs, successors, assignees, and legal representatives of each Party for a period of three (3) years after the expiration or termination of this Agreement.

The Parties hereby designate, without limitation, as Confidential Information the following: the prices that the Parties charges for their services; all financial, banking, credit and accounting information, data, statements and reports; the names of, and information regarding, the Billable Leads; the Lead Management System data, information and reports; and all information regarding XX's clients. Provided, however, that Confidential Information shall not include any information that (i) is or subsequently becomes publicly available without the receiving Party's breach of any obligation; (ii) became known to the receiving Party prior to disclosing Party's disclosure under of this Agreement; (iii) became known to receiving Party from a source other than the disclosing Party who, to the receiving Party's knowledge, did not breach an obligation of confidentiality owed to disclosing Party; or (iv) is independently developed by the receiving Party without use of the disclosing Party's other Confidential Information.

**19. Non-Waiver; Severability.** No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party. If any provision contained in this Agreement is determined to be invalid, illegal or unenforceable in any respect under any applicable law, then such provision will be severed and replaced with a new provision that most closely reflects the real

11

intention of the Parties, and the remaining provisions of this Agreement will remain in full force and effect.

## 20. Non-Circumvention.

(a)    It is expressly agreed that the identities of all customers of XX shall constitute Confidential Information and, further, that Contractor shall not, without the prior written consent of XX, during the period of time that Contractor is providing services to XX and its customers and for a period of three years thereafter:

(i)    directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertakings relating in any way to the provision of lead generation services with any customer of XX introduced to Contractor through the provision of services by Contractor to XX and the customer; or

(ii)    seek to by-pass, compete against, avoid or circumvent XX from providing lead generation services to any customers that XX has introduced to, or otherwise made known to, Contractor.

(b)    Contractor covenants that any financial gain made by it and/or any of its Affiliates from a breach of this section shall be held in trust for the benefit of XX, and, until paid over to XX, shall bear interest at a rate of 7% per annum.  This remedy is not exclusive and shall not preclude any suit or remedy for breach hereof.

**21. Remedies.**  The parties acknowledge that monetary damages may not be sufficient remedy for unauthorized disclosure of Confidential Information and that Disclosing Party shall be entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

**22. Non-Solicitation.**  Contractor agrees that during the Term and for a period of three (3) years thereafter, neither it shall directly or indirectly: (i) divert or attempt to divert from XX any business of any kind in which XX is engaged in during the Term; (ii) solicit or attempt to solicit any known relationshiXX procured by XX; or (iii) copy, design or replicate any similar marketing creative or text previously marketed or designed by XX; or (iv) attempt in any manner to deal directly or indirectly in any manner with any of the individuals or companies related to the Agreement including by having any part of or deriving any benefit from the Agreement or any aspect thereof; or (v) by-pass, compete, avoid, circumvent, or attempt to circumvent XX relative to the Agreement including by utilizing any of the Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information.

## 23. Dispute Resolution.

(a)    Binding Arbitration.  The Parties agree that any dispute arising hereunder will be submitted for resolution by binding and final arbitration.  Arbitration shall be administered by JAMS in accordance with the Streamlined Arbitration Rules and Procedures of JAMS as they exist on the date hereof (unless otherwise agreed by the parties hereto), applying the substantive internal laws of California, and judgment upon the award rendered by the arbitrators may be

12

entered in any court having jurisdiction. The arbitration will be conducted in the English language in Orange County, California, in accordance with the United States Arbitration Act. There shall be one arbitrator, named in accordance with such rules. The arbitrator shall issue a written explanation of its decision. IN AGREEING TO ARBITRATION, THE PARTIES ACKNOWLEDGE THAT EACH IS GIVING UP THE RIGHT TO HAVE THE DISPUTE DECIDED IN A COURT OF LAW BEFORE A JUDGE OR JURY AND INSTEAD ARE ACCEPTING THE USE OF ARBITRATION FOR RESOLUTION ADMINISTERED BY JAMS. The fees of the arbitrator will be paid initially equally by XX and Contractor.

(b)     Attorney Fees. The prevailing Party in any dispute hereunder, whether or not arbitrated, shall be entitled to an award of reasonable attorney fees and costs incurred in connection with the resolution of the dispute. In an arbitration, the prevailing Party shall be determined by the arbitrator in its decision and the award shall be in an amount to be determined by the arbitrator and shall include all fees of the arbitrator paid by the prevailing Party. In the event of a dispute over payment to XX, interest shall accrue on any unpaid amount ultimately determined to be due to XX hereunder at a fixed rate equal to ten percent (10%) per annum from the date the payment was determined to be due until the date the payment is made.

## 24. Miscellaneous.

(a)     Notices. All notices, consents, requests, instructions, approvals and other communications required by this Agreement will be validly given, made or served if in writing and delivered personally or by a nationally recognized overnight delivery service, addressed to Contractor or XX at the address for each set forth on the signature page hereto (or such other address as is subsequently furnished in writing by a Party to the other Party in accordance with this provision). In addition, concurrently with the transmission by overnight delivery or personal delivery, such notices or communications shall be transmitted via email to a designated officer of the receiving Party.

(b)     Entire Agreement. This Agreement contains the entire understanding of the Parties with respect to the subject matter contained herein. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein. This Agreement supersedes all prior agreements and undertakings between the Parties with respect to such subject matter except, if applicable, to any, Non-Disclosure Agreement executed by the Parties.

(c)     Waivers and Interpretation. No waiver of any term or condition of this Agreement, in any one or more instances, will constitute a waiver of the same term or condition of this Agreement on any future occasion. This entire Agreement shall be interpreted as though drafted by both Parties without reference to which Party drafted a particular provision. The headers contained in this Agreement for purposes of convenience only and shall not be used to interpret or limit any particular provision. This Agreement will be governed by and interpreted in accordance with the laws of the State of California without regard to conflict of laws principles.

(d)     Assignment. Neither party shall have the right to assign this Agreement without the prior written consent of the other party.

13

(e)     Severability of Invalid Provision. If any one or more covenants or agreements provided in this Agreement is contrary to law, then such covenant or agreement will be null and void and will in no way affect the validity of the other provisions of this Agreement, which will otherwise be fully effective and enforceable.

(f)     Successors and Assigns.     This Agreement and the various instruments and agreements delivered in connection with the consummation of this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

(g)     Counterparts. This Agreement and any agreements or instruments contemplated hereby may be executed in one or more counterparts, and will become effective when one or more counterparts have been signed by each of the Parties. Facsimile or scanned signatures shall be deemed to be and shall be treated for all purposes as original signature pages.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**Centerpointe Lending Student Loan Services (XX)**

By:
Name:          JEFF SILHANEIL
Title           COO
Email:          JEFF@CENTRPT.NET
Date:      3-8-17

**Ivault Services Phil, Inc. (Contractor)**

By:
Name:          John Shaoni
Title:          Managing Member
Email:          leads@ivaultb2bleads.com
Date:          3/9/17

14

## EXHIBIT A – ORDER

### Order #: 002

This Order, dated as of the date on which it is executed and delivered by the Parties (the "Effective Date"), is hereby made by and between **Centerpointe Lending Student Loan Services** ("XX") and Ivault Services Phi, Inc. ("Contractor") pursuant to the Vendor Services Agreement (the "Agreement"). Capitalized terms used herein without definition shall have the meanings given them in the Agreement.

### Type of Marketed Product/Service

The Marketed Product/Service for this Order is "Doc Preparation." A "Transfered Call" means any product offering to a Billable Lead in which a Lead call is generated and lasts past the buffer time.

The method of marketing is as follows: Websites administered by contractor or its subcontractor or its subcontractor's Contractor will collect express written consents from consumers for all forms of marketing, including telephone calls, text messages, and short messages, including through any automated phone dialing system and/or artificial or prerecorded voice, as well as emails and direct mail. The designated entity or entities upon which the affirmative consents from consumers are being collected and upon whose behalf the marketing is being conducted is Student Loan Debt Forgiveness and any of XX's clients, business partners or third party goods or service providers as provided in writing to Contractor by XX.

### Order Fees Summary

Billable Lead Fees (Per Billable Lead): ▮
Minimum Number of Billable Leads Per Day: ▮
Maximum Number of Billable Leads per Day: ▮
Total Billable Leads Ordered: 1000

### Order Details

Billable Lead Requirements:
- Showed interest in getting help with their Student Loans

Billable Lead Information:

Raw call with 60 second buffer.

Contractor shall deliver the Minimum Number of Billable Leads to XX as ordered and reported in the Lead Management System. Contractor shall not deliver more than the Maximum Number of Billable Leads without express written permission from XX. XX acknowledges that Contractor will on a best effort basis deliver the Minimum Number of Billable Leads ordered.

15

**Payment Terms**
Contractor shall invoice XX for the Total Billable Leads Ordered upon signature of the agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**Centerpointe Lending Student Loan Services (XX)**

By:
Name:      JEFF SILHAVEK
Title:      COO
Email:      JEFF@CENTGRPT.NET
Date:      3-8-17

**Ivault Services Phil, Inc. (Contractor)**

By:
Name:      John Shaoni
Title:      Managing Member
Email:      leads@ivaultb2bleads.com
Date:      3/9/17

## EXHIBIT B - TELEMARKETING VENDOR PROTOCOLS

XX is committed to full legal compliance and transparency in its operations. Accordingly, XX requires that its vendors share the same philosophy in providing XX with telemarketing services. XX requires that Contractor ("Telemarketing Vendor") shall comply with all applicable U.S. laws including the U.S. Federal Trade Commission's Amended Telemarketing Sales Rule and the Telephone Consumer Protection Act of 1991 ("Consumer Protection Laws"), at all times. Consistent with this requirement, XX requires all telemarketing vendors who conduct telemarketing or use any inbound or outbound telemarketing to generate or qualify Billable Leads (the "Campaigns") agree to the following specific protocols in order to work with XX:

1. Representations and Warranties. Telemarketing Vendor represents that it has and will continue to comply with all applicable federal, state, and local statutes, laws, regulations, rules, judgments, orders and decrees applicable to it, including but not limited to all federal, state, and local laws, rules, regulations and industry guidance that apply to the solicitation, collection, and use of Billable Lead information. Laws and regulations applicable to this provision including, without limitation, the Consumer Protection Laws.

2. Agent Behavior: Telemarketing Vendor shall be solely responsible and liable (a) for all call

16

agents and telemarketing personnel (whether employed or contracted by Telemarketing Vendor) used by Telemarketing Vendor in a Campaign and (b) for any intentional or unintentional omissions or misstatements by Telemarketing Vendor personnel, during any Campaign. All Telemarketing Vendor call agents shall conduct all calls in a Campaign in compliance with applicable Law and shall intentionally or unintentionally misstate or omit any material fact in connection with the applicable Campaign.

3. Training: Telemarketing Vendor must train and inform personnel engaged in any aspect of telephone solicitation in the existence and use of federal and state "Do Not Call" registries, Contractor's internal "Do Not Call" list and these protocols.

4. Information Requests: In the event of any consumer complaint resulting from a Campaign Telemarketing Vendor shall provide XX, with two (2) business days upon request by XX all relevant information regarding such consumer, including call recordings, call times, opt in information, proof of consumer consent to be called, and proof of DNC scrubbing. This provision shall survive the termination of this Agreement indefinitely and Telemarketing Vendor agrees that it shall provide XX with any call recording or proof of consumer consent within two (2) business days even after termination of this Agreement for any reason.

5. To the extent that Telemarketing Vendor makes any outbound telemarketing calls or sends any texts, pre-recorded or fax messages to consumers that have not opted in or consented to receive such communications in compliance with applicable Law, Telemarketing Vendor shall (a) possess a Subscription Account Number (" _N/A all optin_    ") for purposes of accessing the United States National Do Not Call Registry ("NDNCR") and such SAN shall be disclosed to XX in writing and (b) use its SAN number to access and scrub such call lists against (i) the NDNCR (National Do Not Call Registry) and applicable state "Do Not Call" registries, (ii) any wireless or ported number lists (such as Neustar) and purge all applicable "Do Not Call" and wireless/ported numbers listed on these registries from any call lists used by Telemarketing Vendor, all in accordance with applicable Law. Telemarketing Vendor acknowledges that it must scrub all call lists against the NDNCR and wireless lists on an on-going basis before initiating any telephone solicitations, all in compliance with applicable Law, including, without limitation, Consumer Protection Laws. To the extent that Telemarketing Vendor's telemarketing activities only include receiving inbound calls from consumers, Telemarketing Vendor represents and warrants that neither Telemarketing Vendor nor any of its agents/affiliates will make any outbound calls or send any texts, faxes, pre-recorded messages, or automated messages to any consumer under this Agreement.

6. Telemarketing – With respect to any inbound or outbound telemarketing services used by XX under this Agreement, Contractor shall (1) provide the name, address, and contact person for every telemarketer used, (2) provide a list of all caller ID's and Subscription Account Numbers used by each telemarketer in advance; (3) only use telemarketing scripts that have been pre-approved in writing (4) sign and comply with the Telemarketing Vendor Protocols attached hereto as Exhibit B (the "**Protocols**") as a "Telemarketing Vendor" and (5) require all Subcontractors who telemarket to sign and comply with the Protocols with executed copies of the Protocols sent to XX upon request by XX.

7. Relationship. For the avoidance of doubt, Telemarketing Vendor shall not be deemed to be making any call on behalf of XX's client companies in connection with this Agreement.

17